IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| KENNETH DEEWAYNE LLOYD,<br>Institutional ID No. 02399387,<br><br>           Plaintiff,<br><br>v.<br><br>AKWITTI, *et al.*,<br><br>           Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 1:23-CV-00004-BU[1] |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Kenneth Deewayne Lloyd, an inmate incarcerated by the Texas Department of Criminal Justice (TDCJ), brings this conditions-of-confinement claim under 42 U.S.C. § 1983 against Warden Chimdi Akwitti and Assistant Warden Phillip McCain. *See* Dkt. No. 23. Defendants now bring a Motion for Summary Judgment asserting qualified immunity. Dkt. No. 33.

For the reasons below, the undersigned RECOMMENDS that the Court GRANT Defendants' Motion.

### I.    JURISDICTION

Lloyd brings this action under 42 U.S.C. § 1983, providing the Court with subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3). Venue is proper in the Northern

---

[1] This case was stayed and administratively closed, then reopened and the stay lifted on November 22, 2024. Dkt. No. 30.

District of Texas, Abilene Division, because the events giving rise to Lloyd's claims occurred at TDCJ's John Middleton Unit in Jones County, Texas. *See* Dkt. No. 1. The undersigned has the authority to enter these Findings, Conclusions, and Recommendations after United States District Court Judge James Wesley Hendrix transferred this case to the undersigned for preliminary screening. Dkt. No. 13; 28 U.S.C. § 636(b)(1)(B).

## II.    FACTUAL BACKGROUND

As alleged, Lloyd and more than 200 other inmates were required to sleep on the floor of the gym while at the Middleton Unit. Dkt. No. 1 at 7. Lloyd is one of at least eleven "gym floor" plaintiffs who allege similar facts. Dkt. No. 23 at 2. Through the Court's review of the gym-floor cases, the Court learned that inmates were likely assigned to the gym according to an overarching policy of placing inmates with heat restrictions in air-conditioned housing. *Id*. at 3 fn 3. Each plaintiff, including Lloyd, appears to have had a heat restriction based on a medical condition, a mental health condition, or a prescribed medication, and the gym at the Middleton Unit had air conditioning.[2] *Id*.

Lloyd arrived at the Middleton Unit on or about September 23, 2022, and remained there until his transfer to the Lindsey Unit on or about November 30, 2022.[3] Dkt. No. 19 at 4. Lloyd alleges that he was aware that inmates with heat restrictions, like himself, were

---

[2] It is not clear from the record whether other parts of the Middleton Unit also had air conditioning at the time.

[3] It is unclear how long Lloyd was at the Middleton Unit. In both his complaint and his response to the magistrate judge's questionnaire, Lloyd states he was at the Middleton Unit from September 23, 2022, until November 9, 2022. Dkt. Nos. 1 at 7; 19 at 3. This is a total of 47 days. But he also states he was removed from the gym floor and taken to the Lindsey Unit on November 30, 2022. Dkt. No. 19 at 4. This would be a total of 68 days. This removal date aligns with the medical records that show Lloyd was seen at the Middleton Unit on November 21, 2022, and was first seen at the Lindsey Unit on December 5, 2022. Dkt. No. 34 at 7, 42. Defendants do not address this discrepancy.

2

assigned to the gym floor. Dkt. No. 19 at 6.

As Lloyd alleges, and as the summary judgment record supports, Lloyd had several documented medical conditions and complaints at the time the decision was made to place him on the gym floor. Lloyd suffered from a service-connected injury in 1987, when he broke his back in three places. Dkt. No. 1 at 6. Because of this, his T-11 and T-12 vertebrae were fused together, and he now suffers from sciatica. Dkt. Nos. 1 at 7; 19 at 4. Besides his back issues, he also had right elbow reconstructive surgery in 2012 and right shoulder surgeries in 2012, 2013, and 2015. Dkt. No. 19 at 4.

Despite these documented medical conditions, Defendants required Lloyd to sleep on a mattress directly on the gym floor for his entire 68-day stay at the Middleton Unit. Dkt. No. 19 at 1–2. And when Lloyd complained to Akwitti and McCain that his medical conditions were aggravated by sleeping on the floor, they only responded with "Oh well" and "There's nothing can be done." *Id*. at 5.

Lloyd describes the gym as a "200+ man refugee camp" and alleges that the constitutional violations were never resolved while he was at the Middleton Unit. Dkt. No. 1 at 7. Although Lloyd does not complain, either in his complaint or response to the magistrate judge's questionnaire, about other conditions that were present in the gym, Defendants attach records portraying inoperable restroom facilities and address those conditions in their Motion for Summary Judgment. *See* Dkt. Nos. 34 at 65–96; 33 at 6. Viewing the facts in Lloyd's favor, it is likely that the conditions of sleeping on the floor in a crowded gym were exacerbated by other compounding conditions Defendants were aware of.

3

Lloyd brings this § 1983 claim against Defendants in their individual capacity seeking money damages. Dkt. No. 23 at 14 (dismissing all other claims). Lloyd seeks $55,000 in compensatory damages against each Defendant and $25,000 in punitive damages against each Defendant. Dkt. No. 1 at 4. Lloyd did not respond to Defendants' assertion of qualified immunity.

## III.    LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material[,]" but it must be one that "might affect the outcome of the suit[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine within the meaning of Rule 56 only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020).

A governmental employee who is sued under § 1983 may assert qualified immunity as an affirmative defense to liability. *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992). Qualified immunity protects government officials performing discretionary functions from suit and liability for civil damages to the extent their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When qualified immunity is asserted in a motion for summary judgment, that assertion "alters the usual summary judgment burden of proof." *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010). Movants have no burden "to put forth evidence to meet [their] summary judgment burden for a claim of immunity" and need only assert the defense in good faith. *Beck v. Tex. State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000). "[O]nce properly raised by the defendant, the plaintiff has the burden to negate the assertion of qualified immunity." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (citation and internal quotation marks omitted). This means the plaintiff "must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

In deciding whether a plaintiff has shown a violation of a protected right sufficient to survive summary judgment, courts consider the facts alleged in the light most favorable to the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). But "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, 'or only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). The plaintiff must identify specific evidence in the record and show how it presents a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324; *see also RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). Furthermore, "[t]he court has no duty to search the record for material fact issues." *RSR Corp.*, 612 F.3d at 857; *see also Hernandez v. Yellow*

5

*Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) ("If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search.").

## IV.    ANALYSIS

To overcome Defendants' assertion of qualified immunity on summary judgment, Lloyd must show the existence of a fact issue on each of the following: (1) objectively, Defendants exposed him to a substantial risk of serious harm by denying him the minimal measure of life's necessities; (2) subjectively, Defendants were deliberately indifferent to the risk; (3) the law was clearly established that Lloyd had a constitutional right to be free from the alleged conditions; and (4) in light of clearly established law Defendants conduct was objectively unreasonable.

The first and second elements relate to the first prong of the qualified immunity analysis—the existence of a constitutional violation. The third and fourth elements relate to the second prong of the analysis—a clearly established right. The undersigned will address each element in turn.

Defendants' Motion does little to assist in the analysis. It is true that Defendants, at this stage, need only to assert qualified immunity in good faith. The burden then shifts to Lloyd to show genuine disputes regarding both prongs. However, the undersigned notes that most of Defendants' argument is misplaced and hence unhelpful. Defendants argue that: (1) the objective element fails due to no proof of actual injury; (2) the subjective element fails because Defendants attempted to fix plumbing issues; and (3) that Defendants actions were objectively reasonable in light of clearly established law—without explaining

6

why their actions were reasonable or identifying any clearly established law. Once again, this is not their burden. However, their arguments did nothing to dispute any of Lloyd's allegations. The undersigned will now focus on whether Lloyd met his burden.

Lloyd did not produce any evidence in response to Defendants' Motion. However, the Court may consider Lloyd's verified allegations—including the complaint, response to the magistrate judge's questionnaire, and testimony at Lloyd's *Spears* hearing—as competent summary judgment evidence. *See Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003). Furthermore, at this stage, the Court must "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004).

### 1. The First Prong: A Constitutional Violation

#### a. Eighth Amendment Conditions-of-Confinement Claims

The Eighth Amendment prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, and "[t]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). While the Constitution does not mandate comfortable prisons, it does not permit inhumane ones. *Rhodes* v. *Chapman*, 452 U.S. 337, 349 (1981); *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). An Eighth Amendment violation occurs when prison conditions pose an unreasonable risk of serious damage to a prisoner's health—an objective test—and prison officials act with deliberate indifference to the risk posed—a subjective test. *Garrett v. Lumpkin*, 96 F.4th 896, 900 (5th Cir. 2024).

The objective component also requires showing that the conditions were objectively

"sufficiently serious" or "extreme." *Farmer*, 511 U.S. at 834 (citation omitted) (first quote); *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (second quote). The deprivation must involve a basic human need—such as food, clothing, medical care, and safe and sanitary living conditions—and must deny the inmate of the minimal civilized measure of life's necessities. *Hope v. Harris*, 861 F. App'x 571, 582 (5th Cir. 2021); *Chapman*, 452 U.S. at 347–49. The conditions are measured against the standards of decency that mark the progress of a maturing society. *Chapman*, 452 U.S. at 346–48.

For the objective component, the Court must examine the totality of the circumstances. *Id*. at 363–64. Even if no single condition of confinement alone would be unconstitutional, exposure to multiple conditions may subject inmates to cruel and unusual punishment when they have a "mutually enforcing effect" that produces the deprivation of a single, identifiable human need, such as food, warmth, or exercise. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (explaining that there may be an Eighth Amendment violation where a prisoner complained of a "low cell temperature at night combined with a failure to issue blankets").

The subjective component requires proof that the prison official acted with deliberate indifference to inmate health or safety. *Farmer*, 511 U.S. at 834 (to violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind). The standard is not met merely from a negligent or even a grossly negligent response to a substantial risk of serious harm. *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020).

Therefore, the inmate must show that prison officials were: (1) "aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists"; (2) "subjectively drew the inference that the risk existed"; and (3) "disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (citing *Farmer*, 511 U.S. at 837) (alterations omitted). More simply, the prison officials must know of, and disregard, an excessive risk to a prisoner's health or safety. *See id.* (citation omitted). Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).

      b.  <u>Objective Component</u>

Lloyd contends that he was forced to: (1) sleep on the floor; (2) despite his documented surgeries, chronic pain, and disability; (3) for a total of 68 days; and (4) in an overcrowded gym with more than 200 other inmates, all of which constitutes cruel and unusual punishment. Dkt. Nos. 1 at 6–7, 19 at 4.

      i.  *The gym conditions*

A court evaluating a conditions-of-confinement claim must consider the totality of the circumstances a prisoner was forced to endure. *Chapman*, 452 U.S. at 363–64. The existence of the alleged conditions is undisputed. Moreover, Defendants address additional conditions—such as inoperable toilets shared by more than 200 inmates—that Lloyd does not raise in his verified pleadings. Dkt. No. 33 at 6. This adds a fifth condition to the summary judgment record to be considered as part of the totality of Lloyd's circumstances. Therefore, the undersigned will analyze whether the conditions—viewed not only collectively, but also over time and in light of the inmate's health—had a mutually

enforcing effect sufficient to create a constitutional deprivation.

Given the conditions themselves are undisputed, the undersigned turns next to Lloyd's preexisting medical conditions before turning to the duration of his exposure to harm.

### ii.    Lloyd's medical conditions

Lloyd asserts that he, along with more than 200 other inmates, were assigned to the gym floor due to a heat restriction. Dkt. No. 19 at 6. But Defendants do not elaborate on the process or criteria used in making the gym floor assignments, the reason floor assignments in the gym were necessary in the first place, or how long the wardens expected floor assignments to last once they were implemented. These questions cannot be answered on this record.

Several observations within the medical record provide insight into whether the gym-floor conditions—objectively—posed an unreasonable *risk* of serious damage to Lloyd's health. For example, Lloyd had several documented medical restrictions in effect since 2017 including: (1) lower bunk only; (2) extended medical hours; (3) no repetitive squatting; (4) no climbing; (5) no reaching over shoulder; (6); no repetitive use of hands; (7) sedentary work only; (8) no walking over 200 yards; (9) no lifting over five pounds; (10) no work in direct sunlight; (11) a heat restriction related to his medical conditions; and (12) a second heat restriction related to his psychiatric conditions. Dkt. No. 34 at 19.

Besides his documented restrictions, Lloyd also had a medical history, prior to arriving at the gym, of complaining of chronic back pain. About two months before his gym-floor placement, Lloyd complained of "chronic back pain from when I was in the

military." *Id*. at 24. That physical exam corroborated that Lloyd had past surgeries on his back, left elbow, shoulder, and T11-T12 fusion. *Id*. It also noted his employment history as disabled. *Id*.

Only two weeks before his gym-floor placement, Lloyd placed a sick call complaining of a swollen spine. *Id*. at 11. And only four days before arriving at the gym, Lloyd was seen for "mid back pain" associated with an "old injury from [the] Army." *Id*. at 12. That medical visit noted a history of "similar problems" as well as hypertension, lung disease, and prior fractures of the lumbar spine and pelvis. *Id.* (cleaned up).

And almost two months into Lloyd's time on the gym floor, Lloyd put in a sick call stating that he wanted to be seen for pain associated with three bulging discs in his back. *Id*. at 8. He reported daily pain at a moderate intensity. *Id*.

And yet Lloyd was assigned to sleep on the gym floor despite even his lower-bunk restriction, the supposed purpose of which is to make getting in and out of bed easier. In that respect, the floor is no better than an upper bunk. But notwithstanding his multiple restrictions and medical records reflecting chronic back pain and multiple past surgeries, Lloyd was assigned a spot on the gym floor for his entire 68-day stay.

All to say, the *existence* of Lloyd's medical conditions—some of which reasonably would have counseled against a floor assignment—does not appear to be disputed and are part of the totality of circumstances the Court, and a reasonable jury, should consider in assessing whether Lloyd was objectively exposed to a substantial risk of serious harm.

      *iii.   Duration of Lloyd's exposure to conditions*

Generally, extremely egregious conditions, even for a short duration, can give rise

to an Eighth Amendment claim. *See Taylor v. Riojas*, 592 U.S. 7, 52–54 (2020) (filthy cell with massive amounts of feces, four days; then frigid cell with clogged drain and no clothes, two days). The calculus obviously runs in the other direction, as well—less egregious conditions can become a constitutional violation if a prisoner is forced to endure them for a long time. *See Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) (holding that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards" and observing that "[a] filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months").

Defendants do not dispute that Lloyd was assigned a spot on the gym floor for his entire 68-day stay at Middleton. They also do not dispute that the conditions never improved during his stay. That Lloyd endured these conditions for 68 days is particularly concerning. As the *Hutto* court observed, the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. 437 U.S. at 686–87. Here, considering the facts in a light most favorable to Lloyd, a reasonable jury could find that he was exposed to the combined conditions for 68 days and that this duration aggravated the severity of the overall deprivation. *Harris*, 861 F. App'x at 586 (Haynes J., concurring in part). Ultimately, the combined conditions "might have been tolerable for a few days" but a reasonable jury could find that they became "intolerably cruel" when endured for 68 days. *See Hutto*, 437 U.S. at 686–87. It must also be remembered that the sole reason Lloyd and the other inmates were in the gym was because TDCJ recognized they were medically unable to endure the heat.

iv.    *Mutually enforcing effect of conditions*

12

The summary judgment evidence fails to resolve genuine factual disputes about whether the combined conditions—sleeping on the floor, overcrowding, and frequently inoperative restroom facilities—had a mutually enforcing effect of objectively depriving Lloyd of the basic human need of safe and sanitary living conditions. As discussed, the Court must further consider these combined conditions in the context of: (a) Lloyd's medical conditions when assigned to the gym; and (b) the duration of Lloyd's exposure to the gym conditions. *Harris*, 861 F. App'x at 582. Lloyd's verified pleadings provide more than a scintilla of evidence from which a reasonable jury could resolve these issues in his favor, and Defendants have failed to sufficiently rebut these claims to remove them from the province of a jury.

    c.   <u>Subjective Component</u>

Having determined that fact issues exist as to whether Lloyd was objectively exposed to a substantial risk of serious harm, the undersigned turns now to whether Lloyd can show genuine disputes on whether each warden acted with deliberate indifference to that risk.[4] *See Farmer*, 511 U.S. at 834. The undersigned begins with Akwitti.

    i.   *Warden Akwitti's subjective indifference*

Lloyd asserts that Akwitti was directly aware of the conditions in the gym. According to Lloyd, Akwitti "made [Lloyd] sleep on the gym floor", and when Lloyd complained to Akwitti that his medical conditions were aggravated by sleeping on the floor,

---

[4] The court must address the actions of each warden individually to determine whether qualified immunity applies. *Cass*, 844 F.3d at 730-31; *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999).

Akwitti only responded with "Oh well" and "There's nothing can be done." Dkt. No. 19 at 1, 5 (cleaned up).

Combined with Lloyd's allegation that the conditions never improved, the verified pleadings could reasonably support a finding that Akwitti personally visited the gym and was fully aware of whatever conditions existed. On this, there is no genuine dispute. Common sense also dictates that, even on Defendants' version of the facts, the warden would have not only known of the conditions but also would have made or approved the decision to house inmates in the gym and established the criteria for such assignments.

Lloyd's explanation that inmates were assigned to the gym due to a heat sensitivity is also undisputed. In other words, inmates were assigned to the gym precisely because they had medical or mental health conditions and were being treated for the same. It is reasonable to infer that Akwitti knew that the medically vulnerable inmates housed there, including Lloyd, faced heightened medical risks if confined under other adverse conditions, including those that were unsanitary, overcrowded, unsafe, or otherwise unhealthy.

The duration of Lloyd's stay further strengthens the inference of deliberate indifference. A reasonable jury could conclude that Akwitti had ample opportunity during those 68 days to observe and correct the conditions. In other words, this was not a situation requiring split-second decision-making or an emergency response where qualified immunity typically affords officers the benefit of the doubt. *See Villarreal v. City of Laredo*, 134 F.4th 273, 284 (5th Cir. 2025) (Oldham, J., concurring). The longer Lloyd was in the gym, the more likely it was that Akwitti was both aware of the conditions and had time to effectively abate them, including by relocating the inmates, providing cots, stepping up

14

maintenance, or other measures, but instead disregarded the risk. *Harris*, 861 F. App'x at 586 (Haynes J., concurring in part).

Defendants advance one principal argument here: Akwitti "took reasonable measures to repair amenities, therefore, [he was] not deliberately indifferent." Dkt. No. 33 at 5. But as Defendants note, those measures must be reasonable. *Farmer*, 511 U.S. at 847 ("[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take *reasonable* measures to abate it.") (emphasis added). A reasonable jury could conclude that even repeated attempts to resolve a condition when officials know the attempts are inadequate are unreasonable overall.

Further to this point, Defendants fail to provide context from which the Court can determine whether these remedial actions were reasonable. Akwitti claims that between March 3, 2022, and November 8, 2022, maintenance addressed gym plumbing issues 18 times and repaired the gym heater. Dkt. No. 33 at 6. But the reasonableness of making 18 plumbing repairs in eight months can only be assessed after knowing how many plumbing repairs were in fact needed during that same time. The record is silent on that fact. If the toilets, urinals, and sinks were in a constant state of disrepair despite intermittent fixes— not an unreasonable inference in a confined space with 200 or more inmates—that might reflect on the reasonableness of 18 repairs over eight months.

Given the variables involved, the answers to these questions are difficult to resolve on this record. This is partly because the alleged conditions are by their nature fact intensive. But it is also because the maintenance records in the summary judgment

evidence are of little help. For instance, the undersigned can only find 16 instances of gym plumbing repairs between March and November 2022, and four of those were made to the officers' restroom in the gym. *See* Dkt. No. 34 at 64–96. Of the remaining 12 repairs to the inmate portion of the gym, only three of those were made during the time Lloyd might have been assigned to the gym. And all three were made on the same day, November 9, 2022. *Id*. at 91. While it is possible that three plumbing repairs on a single day were a reasonable response to the gym's plumbing problems during the 68 days Lloyd was at the Middleton Unit, the summary judgment record does not help answer that question, and a reasonable jury might regard that response as unreasonable.

The summary judgment evidence establishes that Akwitti took some remedial measures over several months in response to the conditions in the gym, and elsewhere. The evidence further establishes that the measures that were taken were themselves reasonable. But the Fifth Circuit has held that taking some reasonable measures does not mean an officer, on the whole, behaved reasonably. *Converse v. City of Kemah*, 961 F.3d 771, 779 (5th Cir. 2020) (citing *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 395–96 (5th Cir. 2000)). A reasonable jury could find that despite Akwitti taking some reasonable steps, his overall response to the prolonged conditions in the gym was not, on the whole, reasonable. And that it may not have been, on the whole, reasonable to address only some of the conditions—plumbing—while ignoring some of the more dangerous conditions that posed a substantial risk to Lloyd's health and safety—sleeping on the floor and overcrowding.

Thus, based on the summary judgment evidence, a reasonable jury could find: (1)

16

Akwitti was aware that a large number of inmates, including Lloyd, were assigned to the gym, and that Akwitti likely made that decision; (2) due to the inmates having either a medical or mental health condition or treatment; (3) Akwitti was aware of the adverse conditions in the gym; (4) Akwitti was aware the conditions persisted for months despite remedial measures being taken; and (5) that more remedial measures were within his control to make, but he did not make them. The summary judgment evidence is sufficient to create genuine disputes of material fact as to whether Akwitti acted with deliberate indifference.

<em>ii.    Assistant Warden McCain's subjective indifference</em>

Turning now to Assistant Warden McCain, Loyd alleges that McCain also "made [Lloyd] sleep on the floor", and when Lloyd complained to McCain that his medical conditions were aggravated by sleeping on the floor, McCain only responded with "Oh well" and "There's nothing can be done." Dkt. No. 19 at 2, 5 (cleaned up).

The record of remedial measures is a two-edged sword. Yes, they are evidence of attempts to address the problems, but they are also necessarily evidence of awareness of the problems. Further, if a reasonable jury finds the conditions existed as Lloyd claims, which it could, the same jury could find that those conditions would have been readily apparent to McCain during his visits to the gym.

Moreover, viewing the facts in the light most favorable to Lloyd, it is reasonable to infer that McCain was privy to the same baseline knowledge as Warden Akwitti: that medically vulnerable inmates were housed on the gym floor for an extended time under debased conditions which were not effectively addressed through, what appears to be,

17

routine maintenance.

A reasonable jury could find that despite McCain taking some reasonable steps, his overall response to the prolonged conditions in the gym was not, on the whole, reasonable. Thus, as with Akwitti, a reasonable jury could find: (1) McCain was aware that a large number of inmates, including Lloyd, were assigned to the gym, and that McCain was likely involved in that decision as assistant warden; (2) due to the inmates having either a medical or mental health condition or treatment; (3) McCain was aware of the adverse conditions in the gym; (4) McCain was aware the conditions persisted weeks if not months despite remedial measures being taken; and (5) that more remedial measures were within his control to make, but he did not make them. The summary judgment evidence is sufficient to create genuine disputes of material fact as to whether McCain acted with deliberate indifference.

## 2. The Second Prong: Clearly Established

Finding that a jury could resolve the first prong in Lloyd's favor, the undersigned turns now to whether Lloyd's right to be free from those conditions was clearly established. This second prong involves "two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law." *Hare v. City of Corinth*, 135 F.3d 320, 326 (5th Cir. 1998). Because the undersigned finds that the law was not clearly established, the undersigned does not discuss whether Defendants' conduct was objectively unreasonable.

"To be clearly established, a right must be sufficiently clear that every reasonable

18

official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and modifications omitted). Even if an official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable under the circumstances. *See Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir. 1998).

"There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). First, the plaintiff may identify a case—usually, a body of relevant case law—in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]. *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018)) (internal quotation marks omitted). This first approach "do[es] not require a case directly on point[.]" *Batyukova*, 994 F.3d at 726. But the existence of the right must be "sufficiently clear" that every reasonable officer would have understood the challenged conduct to have been unlawful. *Id.* (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). In other words, "'[t]he central concept is that of "fair warning": The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warnings that the conduct at issue violated constitutional rights.''" *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (quoting, in turn, *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc))).

As the Fifth Circuit has explained:

> Rights are "clearly established" when "existing precedent 'squarely governs' the specific facts at issue," *Kisela v. Hughes*, 584 U.S.100, 104–05, 138 S. Ct. 1148, 1153, 200 L.Ed.2d 449 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 15, 136 S. Ct. 305, 193 L.E.2d 255 (2015) (per curiam)), *not* when a rule is merely "suggested by then-existing precedent," *City of Tahlequah v. Bond*, 595 U.S.9, 12, 142 S. Ct. 9, 11, 211 L.Ed.2d 170 (2021) (per curiam). The Supreme Court recently . . . reminded lower courts "not to define clearly established law at too high a level of generality." *Id.* Rather, courts must determine that existing precedent has rendered the right "beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S. Ct. 4, 8, 211 L.Ed.2d 164 (2021) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam)).

*Henderson v. Harris Cty.*, 51 F.4th 125, 132–33 (5th Cir. 2022).

The second way a plaintiff may demonstrate that a law is clearly established is with "the 'rare' possibility that, in an 'obvious case,' analogous case law 'is not needed' because 'the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 138 S. Ct. at 590). "[I]n an obvious case, general standards can [therefore] 'clearly establish' the answer, even without a body of relevant case law." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021). But "[t]he standard for obviousness is sky high[.]" *Joseph*, 981 F.3d at 337.

Whether a right is clearly established is typically a question of law, but there may be factual disputes which are relevant to the determination. *Cruz v. Cervantez*, 96 F.4th 806, 813 (5th Cir. 2024). But ultimately, to defeat an assertion of qualified immunity, the plaintiff "has the burden to point out clearly established law [and] rais[e] a fact issue as to its violation." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021). Again, Lloyd has not filed a response to the Motion.

a.  <u>A case or body of caselaw</u>

Pertaining to the "case or body of caselaw" path of demonstrating clearly established rights, the Court's "fair warning" inquiry should consider only published opinions issued before Lloyd's assignment to the gym floor on September 26, 2022. *Tolan*, 572 U.S. 650, 656 (2014) (the second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation); *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019) (because unpublished opinions are not precedential, they "do not establish any binding law for the circuit" and thus "cannot be the source of clearly established law for qualified immunity analysis").

To find that Lloyd raised a fact issue on whether his constitutional rights were violated required the undersigned to string together a varied combination of lesser-included fact issues about the individual conditions themselves, the length of time Lloyd was exposed to those conditions, and Lloyd's particular medical conditions. But it is the same complexity of how all these variables interact that preclude a finding that they violated clearly established law.

True, Lloyd is not required to marshal a case on point. And there are some cases which cite to the holding in *Burleson v. Texas Dept. of Criminal Justice* that "Burleson alleged a violation of a clearly established constitutional right: the Eighth Amendment right to be free from conditions of confinement which pose an unreasonable risk of damage to a prisoner's health." 277 F.3d 1374, *2 (2001). But the undersigned does not read *Burleson*, an unpublished decision, as establishing such a broad, general "clearly established right." Other conditions-of-confinement cases that might apply here similarly define that right at

too high a level of generality to conclude that those cases "squarely govern" this case. *Cope v. Cogdill*, 3 F.4th 198, 204–05 (5th Cir. 2021) (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam); *Mullenix*, 577 U.S. at 12 (emphasizing that "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established" (internal quotation marks and citation omitted))).

The authority that does exist is not sufficiently specific to put all reasonable officials on notice that Defendants' conduct was definitively unlawful. *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022). Nor has Lloyd pointed to a body of law that would put the unconstitutionality of these combined conditions "beyond debate." *Ashcroft*, 563 U.S. at 741. Reasonable minds could make arguments either way. Therefore, even though the undersigned finds that Lloyd has created factual disputes regarding whether Defendants violated his right to safe and sanitary living conditions, there was no clearly established body of law at the time that would have put every reasonable officer on notice that this complex set of circumstances definitively violated that right.

b. Obvious exception

The facts here also do not meet the "obvious" exception. *Taylor* and *Pelzer* involved circumstances so egregious that any reasonable officer would have known they violated the Constitution. In *Taylor*, prison officials confined an inmate for six full days in two "shockingly unsanitary cells"—one covered nearly floor to ceiling in massive amounts of feces, and the other frigidly cold with urine on the floor where the inmate was required to sleep naked. 592 U.S. at 7–8. In *Pelzer*, an inmate was restrained to a hitching post for seven hours without bathroom breaks as punishment, forced to remove his shirt so the sun

22

would burn his skin, and taunted with water given first to the dogs and then spilled on the ground. 536 U.S. at 734–35.

Lloyd may have been forced to endure the conditions here for a significantly longer period of time. And it has been suggested that the need for granularity with the "clearly established" prong may be more leniently applied where "the correctional officers had plenty of time to assess their horrific conduct and recognize that it obviously violated the law." *Villarreal*, 134 F.4th at 282 (Oldham, J., concurring). Judge Oldham explained that with the egregious facts of *Taylor*, "it was of no moment that precedent had only clearly established a general prohibition on 'inhumane' conditions of confinement", especially in light of no "exigency". *Id.* (citing *Farmer*, 511 U.S. 832). That said, Judge Oldham observed at the same time, "the Court had apparently 'never—until Taylor—actually used' the obviousness standard 'to decide a case.'" *Id.* fn 6 (citing Comment, *Taylor v. Riojas*, 135 HARV. L. REV. 421, 429 (2021)).

The standard for holding Defendants liable based on "obviousness," rather than clearly established law, is exceptionally high. *Joseph*, 981 F.3d at 337. Although the conditions here were deplorable, they do not rise to the level of deplorability in *Taylor* or *Pelzer*.

Lloyd can show genuine issues of material fact as to the first prong analysis—the existence of a constitutional violation—but not as to the second prong analysis—a clearly established right. Therefore, Defendants are entitled to qualified immunity.[5]

---

[5] In Lloyd's complaint, he seeks compensatory and punitive damages. Dkt. No. 1 at 4. Defendants' Motion spends the bulk of its analysis on whether Lloyd suffered a compensable injury under the PLRA. Dkt. No.

## V.  CONCLUSION

The facts, when viewed in the light most favorable to Lloyd, would permit a reasonable jury to find that Lloyd was objectively exposed to a substantial risk of serious harm and that Defendants were subjectively indifferent to that risk. But the Court should conclude that Lloyd's right to be free from the objectively serious conditions was not clearly established at the time. Accordingly, the undersigned RECOMMENDS that the Court GRANT Defendant Akwitti and McCain's Motion for Summary Judgment on Qualified Immunity.

## VI.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions

---

33 at 4–6. Because Defendants are entitled to qualified immunity, they are immune from suit, and this case should be dismissed. Lloyd's injury, if any, is irrelevant.

of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## VII. CASE TRANSFER

Having completed the preliminary screening of Lloyd's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action Number No. 1:23-CV-00004-H.

ORDERED this 6th day of February 2026.

 

 

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE